Anthony THORNTON, Appellant
(Defendant below),

v.

STATE of Indiana, Appellee
(Plaintiff below).

No. 49S00–9612–CR–750.

Supreme Court of Indiana.

June 9, 1999.

Catherine M. Morrison, Wolf & Morrison, Indianapolis, IN, Attorney for Appellant.

Jeffrey A. Modisett, Attorney General of Indiana, Christopher L. Lafuse, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

SULLIVAN, Justice.

Defendant Anthony Thornton was found guilty of Murder for stabbing his wife to death. He appeals, arguing that the evidence was insufficient to support his conviction. He also contends the trial court improperly excluded certain evidence that he says established the bias of a key State witness against him. Finding the evidence sufficient and no reversible error in the exclusion of evidence, we affirm.

We have jurisdiction over this direct appeal because the longest single sentence exceeds fifty years. Ind. Const. art. VII, § 4; Ind. Appellate Rule 4(A)(7).

### Background

Defendant was married to Jeannine Thornton for thirteen years. They had two children; Jeannine had another daughter, Latoria, aged 14. Their time living together was regularly interrupted by voluntary separations and defendant's incarcerations. When they were living together, their marriage was frequently punctuated by defendant's violent behavior toward Jeannine.

In December, 1994, defendant was arrested for failure to pay child support. At that time, Kenneth Jones moved into the apartment with Jeannine. Shortly thereafter, Je-

annine became pregnant, she believed, with Jones's child. After defendant was released in April, 1995, and Jones was arrested a few weeks later, defendant moved back in with Jeannine.

Two days later, an argument arose over the removal of Jones's belongings. The next morning, Jeannine was found dead on the couch. An autopsy revealed that she died of multiple stab wounds. The State later charged defendant with Murder.[1] Defendant waived his right to a jury trial and a bench trial commenced on July 16, 1996. The next day, the trial court found defendant guilty.

We will recite additional facts as needed.

### Discussion

#### I

Defendant first contends that there was insufficient evidence to find him guilty of murder, asserting that the State presented no direct evidence linking him to the crime and that it did not present evidence refuting defendant's theory of the murder.

When sufficiency of the evidence is challenged, this Court will neither reweigh the evidence nor review the credibility of witnesses. *Powers v. State*, 696 N.E.2d 865, 869 (Ind.1998); *Kingery v. State*, 659 N.E.2d 490, 493 (Ind.1995). We look to the evidence most favorable to the verdict together with all reasonable inferences therefrom and then "determine whether there is substantial evidence of probative value from which the trier of fact might reasonably have found the defendant guilty beyond a reasonable doubt." *Id.* (citing *Landress v. State*, 600 N.E.2d 938, 940 (Ind.1992)); *Powers*, 696 N.E.2d at 869.

#### A

As to defendant's claim that the State did not present direct evidence linking him to the killing, we observe that circumstantial evidence alone will support a verdict of murder. *Utley v. State*, 589 N.E.2d 232, 241 (Ind.1992), *cert. denied,* 506 U.S. 1058, 113 S.Ct. 991, 122 L.Ed.2d 142 (1993); *Heck v. State*, 552 N.E.2d 446, 449 (Ind.1990). It is within the province of the trier of fact to

[1]. Ind.Code § 35–42–1–1(1) (1993).

determine facts from evidence presented to it, and judge the credibility of those facts. *Kingery,* 659 N.E.2d at 493. Additionally, the trier of fact is to draw reasonable inferences from facts established either directly or through circumstantial evidence. *Metzler v. State,* 540 N.E.2d 606, 609 (Ind.1989).

The evidence most favorable to the judgment was as follows. Latoria testified that during the argument over the removal of Jones's belongings, defendant was sharpening a knife in the kitchen. The argument escalated to such a level that Jeannine told Latoria to take the two younger children into the bedroom. Latoria took the children to the bedroom, closed the door, and watched television. She fell asleep at approximately 8:30 p.m., only to be awakened by a scream. Hearing nothing further, she fell back asleep.

At approximately 6:30 a.m. the next morning, defendant entered Latoria's room wearing only boxer shorts and a T-shirt to tell her to get ready for school. According to Latoria, this was the first time that defendant had ever come to awaken her for school. In fact, Latoria had been suspended from school and went back to sleep. At about 10 or 11 a.m., she awoke and noticed what she thought was her mother asleep on the couch under a blanket. Defendant was not in the apartment at this time. Latoria returned to her bed and went back to sleep. At around noon, Latoria discovered that all was not right with her mother and summoned a neighbor and relative, Towanda Robertson, who called the police. As noted *supra,* Jeannine had been stabbed to death. The State later demonstrated that the body had laid on the floor for some time before being moved to the couch.

After the police and ambulance arrived, Towanda Robertson received a phone call from defendant telling her that he had seen the emergency vehicles in front of the apartment and wondered what was happening. He inquired as to the children's well-being but not Jeannine's. When he was later taken into custody, defendant volunteered that he and his wife had a "spat." Defendant further explained that after he left the apartment, he just wandered around Indianapolis the rest of the evening without ever returning or entering the apartment. Defendant later testified that he returned to Jeannine's apartment around 2 a.m., unlocked the door, saw what he believed to be a sleeping Jeannine on the couch, checked on the children, removed his clothes and went to bed alone.

■ The evidence supports an inference that defendant killed Jeannine. First, although the knife used to kill Jeannine was never recovered, Latoria placed defendant in the apartment the evening of her death sharpening a pocket knife. Second, after discovering her mother's body, Latoria had to unlock the door (a door that could only be locked from the outside). Detectives at the scene found no evidence of forced entry. This indicates that the perpetrator had a key to the apartment, which defendant did. (R. at 303–06.) Third, detectives were unable to recover the clothes defendant wore the night Jeannine was killed. Finally, the court could have inferred that defendant had a motive to harm his wife because of anger at her relationship with Jones—his belongings were in the house and she was pregnant with his child.

While the evidence presented by the State is circumstantial, considering all evidence most favorable to the verdict as well as drawing all reasonable inferences, we find the trial court could have reasonably concluded that the defendant killed Jeannine.

B

Defendant also argues that the State failed to disprove defendant's theory of the murder. Defendant contended that Jones conspired to kill Jeannine even though Jones was in jail on the night of her death. In support, defendant presented evidence that Jones had recently threatened the Thornton family; Jones had been violent on previous occasions; and defendant was responsible for reporting Jones to the police and having Jones arrested prior to Jeannine's death.

■ Our review of the record indicates that the State did provide evidence to refute this theory. First, the threat Jones issued against the Thornton family did not appear to be directed toward Jeannine but Ceretta Thornton, defendant's cousin, who had stolen guns belonging to Jones. The State further established that Jones's threat did not include a threat on Jeannine's life. As to

Jones's arrest, it was defendant, not Jeannine, who was responsible.

■ We have held that even when the verdict rests on circumstantial evidence, we need not find the circumstantial evidence adequate to negate every reasonable hypothesis of innocence but only that the inferences that may reasonably be drawn from the evidence are sufficient to enable the trier of fact to find guilt beyond a reasonable doubt. *Deckard v. State,* 670 N.E.2d 1, 4 (Ind.1996); *Davis v. State,* 598 N.E.2d 1041, 1045 (Ind. 1992). We find that standard met here.

## II

■ Defendant also contends that the trial court violated his constitutional right to confront the witnesses against him when it did not admit evidence he offered to establish that Latoria was biased against him. A defendant's Sixth Amendment right of confrontation requires that the defendant be afforded an opportunity to conduct effective cross-examination of state witnesses in order to test their believability. *Davis v. Alaska,* 415 U.S. 308, 315–18, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); *Coates v. State,* 534 N.E.2d 1087, 1095 (Ind.1989). However, this right is subject to reasonable limitations placed at the discretion of the trial judge. *Id.* In *Delaware v. Van Arsdall,* the United States Supreme Court stated:

> It does not follow, of course, that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness. On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.

475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); *Williams v. State,* 681 N.E.2d 195, 199 n.5 (Ind.1997); *McQuay v. State,* 566 N.E.2d 542, 543 (Ind.1991); *Coates v. State,* 534 N.E.2d 1087, 1095 (Ind.1989); *Munn v. State,* 505 N.E.2d 782, 784 (Ind. 1987).

To show Latoria's bias, defense counsel cross-examined Latoria as to her resentment of defendant:

Q: Was [defendant] a father figure to you?

A: Sometimes, yes.

Q: Did he ever try to say, you know, you ought to go to bed early, you ought to do your homework, or you ought to wear this type of clothes, that type of thing?

A: Yes, he wouldn't let me ...

Q: But he really didn't have the authority ... [defense counsel instructed to slow down and let witness answer]

A: Besides he would say I can't go outside and stuff like that.

Q: He told you at times that you could not go outside?

A: He told me I couldn't do a whole lot of things.

Q: How old are you, dear?

A: Fourteen.

Q: So Tony Thornton was in the position of trying to limit your freedom?

A: Right.

Q: But you didn't want your freedom limited because you had other plans?

A: I want to be able to go outside like everybody else.

. . .

Q: Was [defendant] successful, to your mind, Latoria, in limiting what you were able to do?

A: Can you explain some more?

Q: Well you said that he was trying to prevent you from going out and visiting with your friends or doing whatever you wanted to do, is that right?

A: Right.

Q: Was he able to keep you from doing that?

A: Yes.

Q: Did you resent the fact that he was able to keep you from doing that?

A: I had no other choice.

Q: Did you resent it?

A: I ain't like it.

(R. at 311–16.) At this point, defense counsel sought to ask Latoria whether she had a child. The State objected and the trial court found that whether or not Latoria had a child was not relevant to the issue of bias.[2]

After the unsuccessful attempt to solicit testimony from Latoria that she had a child, defendant attempted to admit her medical records establishing this fact and to further demonstrate that Jones was the father of the child. The court ruled that the medical records were not relevant and therefore inadmissible at that time.[3]

Later, defense witness Ceretta Thornton testified in graphic terms that Latoria had an ongoing sexual relationship with Jones.

The trial court expressly permitted the defendant to cross-examine Latoria at length to establish her resentment and bias toward the defendant. And the testimony from Ceretta Thornton placed into the record the fact that Latoria and Jones had been sexual partners. This is not a situation where the fact-finder might have received a significantly different impression of Latoria had the evidence defense counsel sought to introduce been admitted. *Cf. Hendricks v. State,* 554 N.E.2d 1140, 1143 (Ind.Ct.App. 1990). The only limitation imposed was upon evidence of her motherhood and the paternity of her child. As recognized in the quotation from *Van Arsdall supra,* prohibition of all inquiry into the possibility of motive and bias may violate the Confrontation Clause, but trial courts are permitted to impose reasonable limits. This determination is properly within the discretion of the trial court. *Munn,* 505 N.E.2d at 785. Given the age of the witness, the nature of the inquiry, the fact that similar evidence came in from another witness, and that the case was tried to the bench, we cannot say that the trial court abused its discretion in excluding the evidence.

2.  When asked the relevance of such further inquiry, defendant only offered that the testimony would further establish bias towards him.

    Your Honor, the relevancy of this matter is that we have just opened up the discussion as to [defendant's] involvement with this child and his limitations or attempted limitations upon her freedom as a child. Her resentment of those attempts at limitation are clear and

*Conclusion*

We affirm the judgment of the trial court.

SHEPARD, C.J., and DICKSON, SELBY, and BOEHM, JJ., concur.

obvious, bias, motive testimonial implications here. Her behavior in the face of that attempted limitation is also relevant to that issue. (R. at 314.)

3.  The trial court did rule that it would reconsider the admissibility of the medical records should evidence develop supporting their relevance. (R. at 516.)