**Daniel J. WOOD, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 36A01–0303–CR–80.

Court of Appeals of Indiana.

March 18, 2004.

Transfer Denied May 27, 2004.

Kimberly A. Jackson, Indianapolis, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Andrew A. Kobe, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BROOK, Senior Judge.

### Case Summary

Appellant-defendant Daniel J. Wood appeals his convictions and sentence for rape[1] as a Class B felony, criminal confinement[2] as a Class D felony, sexual battery[3] as a Class D felony, battery[4] as a Class A misdemeanor, and public intoxication,[5] a Class B misdemeanor. We affirm in part and remand in part.

### Issues

We expand and restate Wood's six issues as follows:

I. Whether the trial abused its discretion in excluding evidence of the victim's bias;

II. Whether the trial court properly excluded his medical records;

III. Whether the prosecutor committed misconduct;

IV. Whether the trial court committed reversible error in refusing his jury instruction on temporary insanity;

V. Whether the trial court committed reversible error in instructing the jury on battery;

VI. Whether he proved that he was insane at the time of the offenses; and

1. Ind.Code § 35–42–4–1.

2. Ind.Code § 35–42–3–3.

3. Ind.Code § 35–42–4–8.

4. Ind.Code § 35–42–2–1.

5. Ind.Code § 7.1–5–1–3.

VII. Whether the trial court abused its discretion in sentencing him.

## Facts and Procedural History

The facts most favorable to the jury's verdict indicate that on August 22, 2000, Christina Brown lent her husband's pickup truck to coworker Tracy Piercefield to help Piercefield's aunt move out of her apartment. Christina asked her future sister-in-law, Ruth Ann Strong, to drive the truck. Strong was introduced to Wood, Piercefield's brother, and he rode in the truck with her during the move. After the third trip between residences, Wood borrowed money from Strong to purchase a six-pack of beer. Wood gave away two cans of beer and drank the rest. Around midnight, after delivering the last of six or seven loads, Wood borrowed money from Strong to purchase another six-pack. Strong then drove to Piercefield's aunt's new residence to drop Wood off. The pair parked in an alley and talked. Wood tried to kiss Strong and grab her breast. She rejected his advances and told him that she was getting married. Wood apologized and asked if they could be friends. Strong told him that was fine. When someone told Wood that he could not drink beer in the alley, he asked Strong to drive around.

Strong drove around for twenty minutes while Wood drank beer. She told him that she needed to go home and asked where she could take him. Wood replied that he was homeless. Strong stopped in a parking lot and again asked Wood where she could take him. He stated that he would sleep in a ditch and that she could take him home with her. Wood tried to kiss Strong and grabbed at her. She again told him that she was getting married and

that she "wasn't like that." Tr. at 282.[6] Wood stated that he was okay with that and told her that he had a friend near Highway 11 who might let him stay. As Wood gave Strong directions, he described the residence as his uncle's house. Strong became worried.

When Strong pulled into the driveway, Wood told her that no one was home and told her to drive back toward town. As she drove, he rubbed her breasts, attempted to climb over the middle console, and forced the truck onto the grass. Wood put the truck in park and shut off the ignition. He exposed his penis and began to masturbate. Strong exited the truck and started walking away. Wood grabbed Strong's ponytail, put his hand over her mouth, and pulled her back toward the truck. Wood told Strong to get in the truck and drive and stated that she "was going to have sex with him or he was going to take it." Id. at 286. Wood also stated that "if [she] didn't give it to him he was going to rape [her] or something worse" and that she "couldn't keep him from getting what he wanted." Id. Strong refused to have sex with Wood.

Wood exposed and bit one of Strong's breasts, scratched her, bit her neck, hit her head, and put his hands down her pants. He told her that they "were going to sit there until a cop showed up, and when they got there, they would take him to jail and tow the truck out of the driveway." Id. at 287. When Strong asked where she would be, Wood laughed. He told her that she was going to drive to Cypress Lake or that they were going to have sex. En route, Wood told Strong that if she did not want to do it she could turn around and go home. When she attempted to drive toward her friend's house

---

**6.** Indiana Appellate Rule 28(C) provides that "[a]ll paper Transcripts generated on a word processing system shall be accompanied by a copy of the Transcript in electronic format." No such copy accompanied the paper transcript in this case.

in Jonesville, he screamed and grabbed the steering wheel and told her to drive toward a bridge. Wood then asked Strong to stop the truck so that he could urinate. When he opened the door and began to urinate, she grabbed the keys and ran into a nearby beanfield.

Wood called after Strong, telling her that he loved her and would not hurt her. When she did not respond, he began screaming, calling her a bitch and stating that he was going to hotwire the truck and run over her. Strong thought that Wood would "really hurt [her]" if he found her and emerged from the beanfield. *Id.* at 291. He told her that they were going to have sex. She told him no. Wood yanked Strong's ponytail and forced her to the ground. He pulled down her shorts and underwear and engaged in sexual intercourse. Strong cried out in pain.

The pair returned to the truck. Wood told Strong to lie down in the back of the truck. When she refused, he told her to "get [her] fucking ass in the truck, that he wasn't done with [her]." *Id.* at 294. Still crying, Strong got in the backseat and told Wood that she was getting married and did not want to have sex with him. He climbed on top of her and again engaged in intercourse. She stopped resisting because it hurt less if she did not fight with him. Wood nodded off, and Strong attempted to escape. Wood awoke and shut the door on the back of her head. Again Wood engaged in intercourse and nodded off, and again Strong unsuccessfully attempted to escape. When she begged to get out of the truck, he ordered her to move to the front seat and engaged in intercourse while standing outside the truck.

Wood saw a car approaching and screamed at Strong to give him the keys. He told her that they weren't "going to stay because he hadn't seen the car before and he knew he was going to go to jail." *Id.* at 299. After the car drove past, he told her to "sit in the back and be a good girl" and that she knew "what happens to bad girls." *Id.* Wood sat in the front seat and listened to the radio. When Strong exited the truck and began to put her clothes back on, he told her that she "needed to take [her] fucking clothes off and get in the fucking truck, he wasn't done." *Id.* at 300. She disrobed and sat in the driver's seat. Wood fondled her breasts and privates but lost interest and played with the radio. He turned to Strong and asked, "[W]hat are we doing here?" *Id.* at 302. She asked if she could get dressed and go home. He responded, "[F]ine fucking go home bitch you got what you wanted and fucking get home then." *Id.* Strong got dressed and drove toward Christina Brown's home. Wood told her that she "better keep quiet about what happened or something worse could happen." *Id.* at 357–38.

When Strong arrived at Christina's home at approximately 4:30 a.m., Christina's husband Bruce was sitting on the porch. Crying, Strong told Bruce to get the unconscious Wood "the hell out of here." *Id.* at 403–04. Bruce put Wood in his car, drove him to a nearby convenience store, and told the cashier to call the police. When police responded to the call, Wood refused to exit the car. After a struggle, officers handcuffed, arrested, and Mirandized Wood, who was unsteady on his feet and smelled of alcohol. On the way to the jail, Wood asked the officer if he was "gonna take [him] to Columbus where it happened." *Id.* at 580. The officer responded that they were going to Brownstown, whereupon Wood became agitated and attempted to head-butt the officer. When the officer asked what had "happened between him and the female[,]" Wood again became agitated and head-

butted the officer's hand into the officer's face. *Id.* at 581.

The State charged Wood with rape, criminal confinement, sexual battery, battery of the police officer, and public intoxication.[7] Wood filed a notice of insanity defense. The trial court appointed forensic psychiatrist Dr. Ned Masbaum and clinical psychologist Dr. Lawrence Ewert to examine Wood. Dr. Masbaum determined that Wood suffered from a schizotypal personality disorder and a learning disorder and had a history of alcohol dependence but concluded that he was of sound mind at the time of the offenses and able to appreciate the wrongfulness of his conduct. Dr. Ewert determined that Wood suffered from schizophrenia paranoid type with "[p]ossibly anti-social personality disorder and alcohol abuse or dependence" and concluded that he "suffer[ed] from a mental disease or defect which caused him to be unable to appreciate the wrongfulness of his crime or to control his behavior at the time of the offense[.]" *Id.* at 515.

At trial, Wood testified that he asked Strong if she wanted to have sex in the backseat and that she had undressed by the time he reached the other side of the truck. He stated that he had sex with her and that she never told him "no" or "stop." Wood further stated that it would be "bad" if he had sex with someone who told him "no." *Id.* at 729–30. On October 30, 2002, the jury found him guilty as charged. On December 30, 2002, the trial court imposed

an aggregate sentence of thirteen years. Wood now appeals.

## Discussion and Decision

### I. Evidence of Bias [8]

The State filed a pretrial motion in limine in which it sought to exclude, *inter alia*, deposition testimony given by Strong regarding her husband Tracey Koerner's 1995 rape conviction. The trial court granted the State's motion.[9] During his cross-examination of Strong, Wood requested to be relieved of the order in limine. The trial court denied the request but subsequently allowed Wood to make an offer of proof. During the offer, Wood stated that Koerner was Christina Brown's brother and that Wood's cousin, Bobby Wood, had been a witness in Koerner's case. Wood stated that his sister, Tracy Piercefield, would testify that Christina had told her several years ago that if she saw Bobby Wood she would kill him. Wood asserted that he "should be able to argue that [Strong] may have made this story up as pay back, because one of [his] relatives put her husband in prison." *Id.* at 364.

On appeal, Wood asserts that the trial court committed reversible error in excluding this evidence of Strong's alleged bias. In *Thornton v. State*, 712 N.E.2d 960 (Ind. 1999), our supreme court explained that

> [a] defendant's Sixth Amendment right of confrontation requires that the defendant be afforded an opportunity to conduct effective cross-examination of state witnesses in order to test their believa-

7. The State charged Wood with public intoxication and battery under cause number 36C01–0008–DF–222 and with criminal confinement, sexual battery, and rape under cause number 36C01–0008–DF–225. On July 19, 2002, the trial court granted the State's motion to consolidate the two causes for trial.

8. We remind Wood's counsel that Indiana Appellate Rule 46(A)(8)(b) provides that an

appellant's argument "must include for *each* issue a concise statement of the applicable standard of review[.]" (Emphasis added.)

9. Contrary to Wood's assertion, the chronological case summary does indicate that the trial court granted the State's motion in limine. *See* Appellant's App. at 4 (file date 10/29/02).

bility. However, this right is subject to reasonable limitations placed at the discretion of the trial judge. In *Delaware v. Van Arsdall,* the United States Supreme Court stated:

It does not follow, of course, that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness. On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.

475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986).

*Id.* at 963 (some citations omitted).[10]

Additionally, Indiana Evidence Rule 616 provides, "For the purpose of attacking the credibility of a witness, evidence of bias, prejudice, or interest of a witness for or against any party to the case is admissible." Our supreme court has stated, however, that Evidence Rule 616 "should be read in conjunction with Rule 403's required balancing of probative value against the danger of unfair prejudice." *Ingram v. State,* 715 N.E.2d 405, 407 (Ind.1999). Evidence Rule 403 reads, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence."

The State contends that the probative value of the excluded testimony was substantially outweighed by the danger of unfair prejudice and other considerations. The State notes that Strong testified at the deposition that she did not know whether Bobby Wood was related to Wood. *See* Strong Deposition at 5 ("Q. And [Bobby Wood] is related to Dan Wood in some way is that correct? A. I, I'm not really sure. I don't, I'm not positive."). The State also observes that it is unclear how Bobby contributed to Koerner's conviction; that there is no evidence regarding Bobby's relationship with Wood; that Piercefield's testimony regarding Christina's threat would have been inadmissible hearsay;[11] and that there is no evidence that the threat was related to Koerner's conviction. Moreover, the State asserts, evidence of Strong's marriage to a convicted rapist might have misled the jury.

Even assuming that it would have been otherwise admissible, we cannot conclude that Christina Brown's threat is relevant to (and therefore probative of) Strong's purported bias. *See* Ind. Evidence Rule 401 (defining "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"). As for Strong's knowledge of Bobby Wood's kinship to Wood, her equivocal deposition answer on this point is minimally probative at best. Moreover, Wood failed to explain Bobby's

---

**10.** *See* U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him....").

**11.** *See* Ind. Evidence Rule 801(C) (defining "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted"). Wood does not specifically challenge the State's assertion on this point, but merely claims that the excluded evidence established that Christina had threatened to kill Bobby Wood.

role, if any, in Koerner's conviction, let alone the extent of Bobby's relationship with Wood. In sum, we conclude that the probative value of the excluded evidence as to Strong's alleged bias is minimal and is substantially outweighed by the danger of unfair prejudice to Strong, confusion of the issues, and misleading the jury. The trial court did not abuse its discretion here.

## II. Medical Records

█ Wood contends that the trial court erroneously excluded his medical records from Madison State Hospital, where he had sought treatment for chemical dependency. We agree with the State that Wood never offered the medical records into evidence.

The transcript indicates that when defense counsel attempted to ask Dr. Ewert if the records indicated that Wood was on psychotropic medication, the State asked several preliminary questions and ultimately objected on the grounds that the records were not "something that [Dr. Ewert] based [his] report on" and that they were hearsay. Tr. at 544. The trial court overruled the objection. When defense counsel handed the records to Dr. Ewert and asked him to look at a particular page, the prosecutor objected on hearsay grounds and on the basis that the State had never received a copy of the records. During the ensuing volley of objections and responses, the parties and the trial court discussed whether Dr. Ewert had relied on the records as a basis for his opinion and whether he could testify as to their contents. At one point, the prosecutor remarked, "I think [Dr. Ewert] can say he relied on [the medical records], but I don't think [Indiana Evidence Rule 703 [12]]

allows him to regurgitate what's in the [medical records]." *Id.* at 548. Defense counsel responded, "Your Honor, if [Dr. Ewert] reviewed [the medical records] and the facts are that [inaudible] opinions are admissible, whether they are hearsay or not under the expert opinion rule." *Id.*

Ultimately, the trial court ruled that Dr. Ewert was not a "proper sponsor" of the medical records and stated that the proponent of a document "cannot get the document admitted backdoor through a witness who is not a proper sponsor." *Id.* at 549. When defense counsel asked if he could question Dr. Ewert about the "specifics" of the medical records, the trial court responded, "You are not going to get the specifics of this document in through this witness, that's what I'm saying. You are not going to get this document in through this witness." *Id.* at 549–50. Defense counsel then resumed his cross-examination of Dr. Ewert.

Simply stated, the transcript establishes that Wood never actually offered the medical records as an exhibit, but instead unsuccessfully sought to have Dr. Ewert testify as to the contents of the records. Consequently, we need not address Wood's argument that the trial court abused its discretion in excluding the medical records.

## III. Prosecutorial Misconduct

█ Wood contends that during closing argument "the prosecutor attacked Dr. Ewert's competency to render an expert opinion and misstated the evidence." Appellant's Br. at 16. Wood characterizes these utterances as prosecutorial misconduct and notes that he twice objected to

---

12. Evidence Rule 703 provides,

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. Experts may testify to opinions based on inadmissible evidence, provided that it is of the type reasonably relied upon by experts in the field.

the prosecutor's comments. *See id.* (citing Tr. at 774, 801). Inexplicably, however, he offers no argument regarding the comments to which he objected and instead complains about comments to which he did not object. *See id.* at 17–19 (citing Tr. at 775–78). "A party's failure to present a contemporaneous trial objection asserting prosecutorial misconduct precludes appellate review of the claim." *Booher v. State,* 773 N.E.2d 814, 817 (Ind.2002). Since Wood neither alleges nor establishes fundamental error, we need not address his argument further. *See id.* at 818 ("[A]n appellate claim of prosecutorial misconduct presented on appeal in the absence of contemporaneous trial objection will not succeed unless the defendant establishes not only the grounds for prosecutorial misconduct but also the additional grounds for fundamental error.").

### IV. Temporary Insanity Instruction

■ Wood tendered to the trial court the following jury instruction on temporary insanity based on Pattern Jury Instruction 11.15:

Temporary insanity is recognized by the law as well as insanity of a longer period.

It is not necessary for the defense to show the defendant had a prior history of mental illness, nor to show he is still suffering from a continuing mental disease or defect. These are just some circumstances which you may consider with all other circumstances to determine whether the defendant was legally responsible for his actions on (date).

Appellant's Br. at 20. Wood asserted that the instruction correctly stated the law and contended that "there was at least some evidence to support the [giving] of this instruction as one of the doctors said he was not insane, one of the doctors said he was insane, [and] ... the doctor[ ] who said he was not insane said that alcohol tended to amplify the problem." Tr. at 822. The trial court refused the instruction.

■ Wood argues that the trial court abused its discretion in refusing the instruction.

The purpose of an instruction is to inform the jury of the law applicable to the facts without misleading the jury and to enable it to comprehend the case clearly and arrive at a just, fair, and correct verdict. Instruction of the jury is generally within the discretion of the trial court and is reviewed only for an abuse of that discretion. A trial court erroneously refuses to give a tendered instruction, or part of a tendered instruction, if: (1) the instruction correctly sets out the law; (2) evidence supports the giving of the instruction; and (3) the substance of the tendered instruction is not covered by the other instructions given.

*Overstreet v. State,* 783 N.E.2d 1140, 1163 (Ind.2003) (citation omitted), *cert. denied* (2004).

We agree with the State's assertion that the substance of the temporary insanity instruction is covered by other instructions given by the trial court. Final instruction 9 reads in pertinent part that "on the sole issue of not responsible by reason of insanity the defendant has the burden of proving he was insane *at the time of the act charged* by a preponderance of the evidence." Appellant's App. at 245 (emphasis added). Final instruction 8 provides that the trial court is required to call two mental health professionals "to testify at trial concerning their opinion about the defendant's sanity *at the time of the offense.*" *Id.* at 246 (emphasis added). Also, final instruction 9 provides in relevant part, "A person is not responsible for having engaged in prohibited conduct if, as a result

of mental disease or defect, he was unable to appreciate the wrongfulness of the conduct *at the time of the offense." Id.* at 247 (emphasis added). Because these instructions informed the jury that they need only find that Wood was insane at the time of the offense, the trial court did not abuse its discretion in refusing his temporary insanity instruction. *See Gambill v. State,* 675 N.E.2d 668, 675 (Ind.1996) (upholding trial court's refusal of defendant's temporary insanity instruction).

## V. Battery Instruction

Wood was charged with battery as a Class A misdemeanor for head-butting one of the arresting officers. Final instruction 13 reads, "The crime of battery is defined by statute as follows: A person who knowingly or intentionally touches another person in a rude, insolent, or angry manner commits battery, a Class B misdemeanor. However, the offense is a Class A misdemeanor if: It is committed against a law enforcement officer." Appellant's App. at 252. At trial, however, the court instructed the jury thusly: "The crime of Battery is defined by statute as follows: A person who knowingly or intentionally touches another person in a rude, insolent or angry manner commits Battery, a Class B Misdemeanor. However the offense is a *Class B* misdemeanor if it is committed against a law enforcement officer." Tr. at 810 (emphasis added). When the trial court repeated the instructions to the jury during deliberations, it again stated that battery "is a Class B misdemeanor if it is committed against a law enforcement officer." *Id.* at 831.

Wood contends that he is entitled to reversal, arguing that the battery instruction as given clearly misstates the law and noting that the verdict forms listed only battery as a Class A misdemeanor. We first observe that Wood failed to object to the trial court's *lapsus linguae* and has

therefore waived this issue on appeal. *See Boesch v. State,* 778 N.E.2d 1276, 1279 (Ind.2002). We further observe that the trial court twice told the jury that should it find that "the State did prove each of the elements beyond a reasonable doubt and [it has] considered and rejected the defense of insanity and the idea of mental illness, [it] should find [Wood] guilty of Battery, a Class A misdemeanor." Tr. at 811, 832–33. Wood does not assert that the State failed to prove each of the elements of Class A misdemeanor battery beyond a reasonable doubt. In sum, the trial court's error can only be considered harmless.

## VI. Insanity Defense

A criminal defendant must establish the defense of insanity by a preponderance of the evidence. Ind.Code § 35–41–4–1(b) (citing Ind.Code § 35–41–3–6). Indiana Code Section 35–41–3–6 provides:

(a) A person is not responsible for having engaged in prohibited conduct if, as a result of mental disease or defect, he was unable to appreciate the wrongfulness of the conduct at the time of the offense.

(b) As used in this section, "mental disease or defect" means a severely abnormal mental condition that grossly and demonstrably impairs a person's perception, but the term does not include an abnormality manifested only by repeated unlawful or antisocial conduct.

Wood contends that he proved that he was insane at the time of the instant offenses. As our supreme court explained in *Gambill,*

A determination of insanity is a question for the trier of fact. The jury is free to disregard the testimony of experts and rely upon that of lay witnesses. A jury is not obligated to believe expert testi-

mony on the issue of insanity and may consider lay opinion testimony on the issue of sanity. Accordingly, the standard of review is a deferential one. A convicted defendant who claims that his insanity defense would have prevailed at trial is in the position of one appealing from a negative judgment, and such a judgment will be reversed only when the evidence is without conflict and leads to but one conclusion which the trier of fact did not reach.

*Gambill,* 675 N.E.2d at 672 (citations and quotation marks omitted).

Wood champions the findings of Dr. Ewert and criticizes the findings of Dr. Masbaum as to his ability to appreciate the wrongfulness of his conduct, but the fact remains that the evidence is not without conflict as to his sanity. The jury considered evidence of Wood's history of eccentric behavior and mental and substance abuse problems, but it was free to disregard Dr. Ewert's testimony and agree with Dr. Masbaum's determination that he was not insane at the time of the offenses. Wood himself testified that Strong consented to sexual intercourse and that it would be wrong for him to have sex with someone who told him "no." The jury could have disbelieved Wood's version of events but nevertheless determined that he appreciated the wrongfulness of the charged conduct. As such, we must decline Wood's invitation to reverse his convictions.

### VII. Sentencing

The trial court sentenced Wood as follows:

The Court having considered the evidence (inaudible) here at this hearing, the exhibits, the arguments of counsel, and having complied with the statutory requirements that I consider the nature and circumstance of this offense [sic], the character and condition of the Defendant. The potential aggravating and mitigating circumstances. Noting that the Defendant has an extensive criminal record. Noting that the Defendant has a mental impairment of some degree and having considered all of those things. But, also I think important to note that the fact questions in this case were resolved by twelve (12) citizens of this County. From the 30th of October, they had the opportunity to determine the questions presented in this case and they did it in a long and laborious process. All of us who were involved in the trial remember how long the jury was out in determining the outcome of this case. But, they resolved the questions that were presented in this matter. The questions of guilt and the questions of the mental status of the Defendant. It is true that the two (2) mental health experts that I called as witnesses had completely different prospectives [sic] and conclusions about this case. Our jury was required to debate and decide that issue. Certainly no one in this Courtroom knows what the jury said or what was going on in the deliberations, but again, the length of time that they took would indicate, I think fairly, that they examined the questions from all angles. I am not in a position to retry this case. That's what the jury did and what their diligence did. There was one statement from the trial, however, that I think is still significant because I think there is one sentence out of that trial that basically answers the two (2) questions. One, uh, the two questions raised by the ... by the, uh, mental defense raised here. The victim testified that, and it was never refuted from what I can tell, testified that the Defendant said, "We are going to have sex even if I have to go to jail." In one sentence the question of prospective [sic] and percep-

tion is answered and the question of right and wrong is also answered in one sentence. The Court having considered the information before it, Madam Court Reporter, is now prepared to announce sentence in this case. The Defendant having been found guilty under Count I of the Offense of Public Intoxication, a Class "A" Misdemeanor, now sentences the Defendant to one (1) year in the Jackson County Jail. On Count II, Judgment of a Class "A" Misdemeanor is entered against the Defendant on the Offense of Battery. The Court now sentences the Defendant on that Count to one (1) year in the Jackson County Jail to be served consecutively to the sentence for Public Intoxication. On Count III, the jury having found the guilty ... the Defendant guilty of the Offense of Criminal Confinement, a Class "D" Felony, Judgment of a Class "D" Felony is now entered and the Court now sentences the Defendant to the appropriate penal facility for a period of one and one-half (1½) years. That sentence to be consecutive to the sentence for Battery and the sentence for Public Intoxication. The jury having found the Defendant guilty of the Offense or Rape in Count V, now sentences the Defendant to the Indiana Department of Corrections [sic] for a period of ten (10) years. That sentence to be consecutive to the Criminal Confinement, Criminal Battery and Public Intoxication. Having found the Defendant guilty of Count IV, Sexual Battery, a Class "D" Felony, the Court now sentences the Defendant to the appropriate penal facility for a one and one-half (1½) year term. That sentence to be concurrent to the Rape conviction. Costs of this action assessed to the Defendant. The sentences for the Rape

and Sexual Battery are to be served first. The sentence for Criminal Confinement shall be served second. The sentence for Battery shall be served third. And the Public Intoxication served fourth. That is the judgment of this Court.

Tr. of Sentencing Hearing at 46–49. In its written sentencing order, the trial court properly amended the public intoxication conviction to a Class A misdemeanor and entered the corresponding sentence as 180 days in the Jackson County Jail. Appellant's App. at 303.

 Wood raises several arguments regarding his sentence, only two of which we must address. First, we agree with Wood's contention that the trial court erroneously found that he never refuted Strong's testimony about his desire to have sex even if he had to go to jail. As previously mentioned, Wood consistently maintained that Strong consented to sexual intercourse. Second, and more important, we agree with Wood's contention that the trial court's sentencing statement does not support the imposition of consecutive sentences. "In order to impose consecutive sentences, a trial court must find at least one aggravating circumstance." *Ortiz v. State*, 766 N.E.2d 370, 377 (Ind.2002). The trial court mentioned Wood's criminal history but did not specifically find this to be an aggravating circumstance.[13] We therefore remand so that the trial court may clarify its sentencing statement and resentence Wood, if necessary. In doing so, the trial court must (1) identify all significant aggravating and mitigating circumstances; (2) cite the specific facts and reasons for finding the existence of each such circumstance; and (3) articulate an

---

**13.** Likewise, the trial court mentioned Wood's "mental impairment" but did not specifically find this to be a mitigating circumstance.

evaluation and balancing of the aggravating and mitigating circumstances. *See id.*

Affirmed in part and remanded in part.

SULLIVAN, J., and ROBB, J., concur.