**Sirlando D. LOGAN, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 02S00–9708–CR–448.

Supreme Court of Indiana.

May 26, 2000.

Randall J. Hammond, Deputy Public Defender, Fort Wayne, Indiana, Attorney for Appellant.

Jeffrey A. Modisett, Attorney General of Indiana, Arthur Thaddeus Perry, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellee.

RUCKER, Justice

## CASE SUMMARY

A jury convicted Sirlando Logan of murder, felony murder, and robbery of a pizza deliveryman. The State requested and the jury recommended that Logan be sentenced to life imprisonment without parole. The trial court followed the jury's recommendation. The trial court also sentenced Logan to a term of years for robbery as a Class A felony. In this direct appeal Logan raises six issues for our review which we separate into seven and rephrase as follows: (1) did the trial court err in denying Logan's motion to suppress evidence; (2) did the trial court err in allowing evidence of a witness's out-of-court identification of Logan; (3) did the trial court err in precluding Logan from questioning prospective jurors regarding life without parole during *voir dire;* (4) did the trial court err in precluding Logan from cross-examining a witness regarding a juvenile car-jacking adjudication; (5) did the trial court err in permitting the State to question Logan regarding a prior conviction; (6) was the evidence sufficient to support the convictions; and (7) was the evidence sufficient to support a sentence of life without parole. We address *sua sponte* whether the trial court erred in sentencing Logan for robbery as a Class A felony.

We affirm and remand.

## FACTS

In the late evening hours of February 15, 1996, Logan and four accomplices ordered a pizza from Saylor's Pizza Parlor in Fort Wayne and directed that it be delivered to a nearby address. Saylor's Pizza employee Milton Turner went to the address, knocked on the door, and a woman answered. She informed Turner that she had not ordered pizza. Logan, who was

standing on the front porch of the building, told Turner the pizza was to be delivered to a side apartment that was located down a dark hallway. Turner refused to enter the hallway and told Logan that whomever ordered the pizza would have to call Saylor's Pizza to confirm the address. Turner left and drove back to work.

Logan and his companions made another call to Saylor's Pizza demanding delivery of their order. When Turner returned, he told the store's owner that he would not re-deliver the pizza because he saw four shadows in a dark hallway and believed he was being lured into a dangerous situation. Employees Don Riebersol and Jean Poff agreed to make the delivery.

Riebersol and Poff drove to the address and knocked on the door. Logan was again standing on the front porch and motioned the pair to come to the side apartment down the dark hallway. They complied. Once in the hallway, they were confronted by three other young men. Logan stood behind them and told Riebersol to knock on the apartment door. Riebersol again complied and a young male answered. Riebersol handed the pizza to the man and asked about payment. Logan produced a handgun and, using it as a club, struck Riebersol in the face. Logan then began firing the handgun at Riebersol. Riebersol, Poff, and Logan's companions ran out of the hallway. Riebersol was shot three times and collapsed on the sidewalk outside the apartment. As Riebersol lay on the ground, Logan grabbed him by the hair, lifted his head off the ground, and put the gun to his head. Poff, who had escaped injury, screamed and pleaded for Logan not to kill Riebersol. Logan dropped Riebersol's head onto the ground, reached inside Riebersol's pocket, removed cash, and fled. Riebersol ultimately died of a gunshot wound to the abdomen.

Later that evening, police determined that the call to Saylor's Pizza had been made from the home of three of the young men involved in the robbery. Those men identified Logan as the shooter and gave police the address where Logan was staying. Logan was residing with Helen Cunegin and her son, using the living room couch as a bed. Police went to the address and knocked on the door. Logan answered and the police immediately took him into custody. Police obtained Cunegin's consent to search the home and discovered pizza boxes and the gun used in the shooting.

The State charged Logan with murder, felony murder, and robbery resulting in serious bodily injury. The State also sought to have Logan sentenced to life without parole. In a bifurcated trial, a jury convicted Logan as charged and recommended that Logan be sentenced to life without parole. On the robbery conviction, the trial court sentenced Logan to thirty years imprisonment. Upon the jury's recommendation, the trial court sentenced Logan to life without parole for murder. The trial court did not sentence Logan on the felony murder conviction. This direct appeal followed. Additional facts are set forth below where relevant.

## DISCUSSION

### I. Search and Seizure

Prior to trial, Logan filed a motion to suppress as evidence the gun and pizza boxes. After a hearing the trial court denied the motion. Over Logan's objection, the evidence was introduced at trial. Logan contends the trial court erred in allowing the exhibits into evidence because the search was conducted without a warrant and that Cunegin's alleged consent to his private living space was not valid.

 Searches and seizures "conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Middleton v. State*, 714 N.E.2d 1099, 1101 (Ind.1999) (quoting *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct.

507, 19 L.Ed.2d 576 (1967) (footnote omitted)). One exception to the federal prohibition on warrantless searches exists where consent to a search is given by a third party who has common authority over the premises. *United States v. Matlock,* 415 U.S. 164, 171, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *Brown v. State,* 691 N.E.2d 438, 443 (Ind.1998). The consent of one who possesses common authority over the premises or effects is valid against the absent, non-consenting person who shares the authority. *Trowbridge v. State,* 717 N.E.2d 138, 144 (Ind.1999). Common authority depends on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-habitants has the right to permit the inspection. *Id.* The State has the burden of proving that an exception to the warrant requirement existed at the time of the search. *Brown,* 691 N.E.2d at 443. Additionally, when reviewing a trial court's determination of the validity of a search, we consider the evidence favorable to the trial court's ruling and any uncontradicted contrary evidence. *Id.* The test is sufficiency of the evidence. *Id.*

Logan contends that Cunegin did not possess common authority over the living room and thus, lacked the authority to consent to the search. He cites the testimony of Cunegin and her son given at the motion to suppress hearing, indicating they would not enter the room without Logan's permission. Although other evidence tended to show Cunegin and her son held common authority over the living room, we need not determine whether they in fact had such authority. That issue bears mainly on the credibility and weight of the evidence, and here the trial court did not render its decision on that basis. Rather, the trial court found that police reasonably relied on Cunegin's consent in searching the room. The trial court's ruling focused on the key inquiry in consent cases, the reasonableness of the police con-

duct. *See Illinois v. Rodriguez,* 497 U.S. 177, 186–87, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990) ("[W]hat is at issue when a claim of apparent consent is raised is not whether the right to be free of searches has been waived, but whether the right to be free of unreasonable searches has been violated."). Even if a third party who consents to a search does not have common authority over, or the requisite relationship to, the premises, the warrantless search is still valid if the officers reasonably believed the third party had common authority or the requisite relationship. *Trowbridge,* 717 N.E.2d at 144; *see Canaan v. State,* 683 N.E.2d 227, 231–32 (Ind.1997); *Rodriguez,* 497 U.S. at 179, 110 S.Ct. 2793; *Perry v. State,* 638 N.E.2d 1236, 1241 (Ind.1994). "As with other factual determinations bearing upon search and seizure, determination of consent to enter must 'be judged against an objective standard: would the facts available to the officer at the moment ... warrant a man of reasonable caution in the belief' that the consenting party had authority over the premises." *Rodriguez,* 497 U.S. at 188, 110 S.Ct. 2793 (quoting *Terry v. Ohio,* 392 U.S. 1, 21–22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).

The record in this case supports the conclusion that the officers reasonably relied on Cunegin's consent. When police sought Cunegin's consent to search the home, she told them that she rented and lived in the home with her son and that Logan was staying with her until he found another place to live. Cunegin's statement came after police had seen her emerge from one of the home's two bedrooms upon their entry into the home in the early morning hours following the shooting. The room over which Logan contends he had exclusive control was a living room furnished in the manner one might expect to find such a room. It contained a couch, a television, stereo equipment, and other furniture. No bed or personal effects were in the room. Furthermore, from the front door of the house, officers had to

pass through the living room to gain access to the rest of the home, and when police arrived, Cunegin's son was in the living room watching television. We find nothing in the record to indicate that police should have been on notice that the room was anything other than what it appeared to be—a living room used by all the residents of the home. Given the facts available at the time, the police officers' belief that Cunegin had the authority to consent to a search of the room was reasonable. The trial court did not err by allowing into evidence the items seized as a result of the search.

## II. Identification

Prior to trial, Logan filed a motion *in limine* seeking to preclude any reference to witness Poff's out-of-court identification. The essential facts are these. On the night of the shooting Poff went to the Fort Wayne Police Department where she was questioned by several officers. After questioning she sat on a bench in the lobby waiting for a ride home. Subsequently, she saw a handcuffed Logan being escorted through the lobby. According to Poff "I just looked up, he looked at me, we stared, I said I'm going to get sick and I just yelled, he's the one." R. at 642. At the hearing on the motion *in limine*, the officer who escorted Logan through the lobby testified that he was unaware of Poff's presence, that he did not present Logan to Poff for identification, and that he was taking Logan upstairs to the detective bureau for questioning. The trial court denied Logan's motion. And over Logan's objection at trial, the trial court allowed introduction of testimony concerning Poff's out-of-court identification. Also over Logan's objection, the trial court allowed Poff's in-court identification. Asserting the confrontation was staged, Logan contends the trial court erred by allowing the out-of-court identification into evidence. He also contends the out-of-court identification provided the basis for Poff's in-court identification.

When a trial court has admitted evidence of both a pre-trial and an in-court identification of the accused by the same witness, we must determine whether, under the totality of the circumstances, the pre-trial confrontation was so unnecessarily suggestive and conducive to irreparable mistaken identification that the accused was denied due process of law. *Brooks v. State,* 560 N.E.2d 49, 55 (Ind.1990). If under the totality of the circumstances we find the out-of-court procedure was not impermissibly and unnecessarily suggestive, then evidence of both the pre-trial identification and the in-court identification are properly admissible. *Id.* at 55. However, the underlying premise of this rule presupposes the police conducted a pre-trial confrontation in the first instance. *See, e.g., Wethington v. State,* 560 N.E.2d 496, 501 (Ind.1990) (commenting on "exigencies associated with the police decision to utilize a show-up procedure as opposed to other alternatives . . . ."). In this case the trial court determined that the out-of-court confrontation was purely coincidental and was not staged by officers of the Fort Wayne Police Department. The evidence of record supports the trial court's determination, and Logan's argument to the contrary amounts to an invitation for this court to reweigh the evidence. We decline. The trial court did not err in allowing testimony of either the pre-trial or the in-court identification.

Further, assuming for the sake of argument that the officers did indeed stage the confrontation and that the confrontation was unduly suggestive, Logan still cannot prevail. Notwithstanding an unduly suggestive pre-trial procedure, in-court identification is nonetheless admissible "if the witness has an adequate independent basis for [the] in-court identification." *Brown v. State,* 577 N.E.2d 221, 225 (Ind.1991); *see also French v. State,* 516 N.E.2d 40, 42 (Ind.1987); *Henson v. State,* 467 N.E.2d 750, 753 (Ind.1984). The factors the court considers in determining

whether an independent basis exists include:

> The amount of time the witness was in the presence of the perpetrator and the amount of attention the witness had focused on him, the distance between the two and the lighting conditions at the time, the witness's capacity for observation and opportunity to perceive particular characteristics of the perpetrator, the lapse of time between the crime and the subsequent identification....

*Wethington,* 560 N.E.2d at 503. Here, Poff testified that there was enough light in the darkened hallway so that she could see everyone there, R. at 634; that she was just a short distance away from where Riebersol had fallen when she saw Logan raise Riebersol by his hair and point the gun at his head, R. at 626; that while engaged in this conduct, Logan looked at her "for a few minutes," *Id.;* and that Logan also pointed the gun at her. R. at 627. We conclude a basis for Poff's in-court identification existed independent of any alleged pre-trial procedure for the out-of-court identification. On this additional ground, the trial court did not err in admitting the in-court identification.

### III. Qualifying Jury for Life Without Parole

Logan next complains about the manner in which the trial court conducted the *voir dire* examination of prospective jurors. The record shows that prior to trial the trial court ruled that during *voir dire* neither party would be permitted to question prospective jurors regarding a sentence of life without parole. Rather, the trial court decided to conduct that portion of the examination itself. In so doing, the court informed the parties that they could submit questions to the court, and if appropriate, it would in turn pose the questions to the prospective jurors.

When the entire jury venire was subsequently brought into the court room, the trial court informed the group that if Logan was found guilty of the crimes charged, there would be a second phase or proceeding in which the jury would be asked to make a recommendation as to whether Logan should be sentenced to a term of years or imprisoned for life without parole. The court then told the prospective jurors:

> And the question I need you to ask or have you consider is whether or not, whether you can follow your oaths as jurors and follow the law and the evidence as it's given to you and make a decision which is going to be a weighing sort of process and we'll help you define it in our instructions and arguments from counsel or whether you would automatically go to a particular recommendation, whether that recommendation be life without parole or to a term of years as recommended by me. And that's the question we'll ask and ask you to answer, is whether you can hear evidence, follow the instructions, or whether you would automatically come to a conclusion without making that weighing decision that we're going to ask.

R. at 310–11.

*Voir dire* of the jurors was then conducted in groups of three. Before the attorneys questioned the prospective jurors, the court asked each group if they could make a decision regarding punishment based upon the law and the evidence or would they automatically recommend life without parole or a term of years based upon other considerations. R. at 341, 359, 363–64, 378–79, 398–99, 414, 437–38, 463, 489–90, 509–10, 529, 548. Each prospective juror who was subsequently seated answered that he or she would make the recommendation based on the law and evidence.

In this appeal, Logan contends "the trial court improperly limited jury selection with regard to the sentencing phase of the trial when it precluded Mr. Logan from 'qualifying' potential jurors as to their feelings, opinions, and predispositions regarding a sentence of life imprisonment without any chance for parole." Brief of Appellant

at 21. Logan argues that just as in capital cases where counsel is permitted to "death qualify" a jury, he should have been permitted to "LWOP qualify" the jury in this case.

■ In capital cases, prospective jurors may be questioned about their beliefs regarding the death sentence to determine whether they will be able to follow their oath and the law regarding imposition of the death sentence. *Witherspoon v. Illinois*, 391 U.S. 510, 522, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968); *Fleenor v. State*, 514 N.E.2d 80, 83–84 (Ind.1987). Those jurors who have firmly-held beliefs that would prevent or substantially impair them from being able to follow the law and consider imposition of a death sentence if called upon to do so, may be removed for cause. *Witherspoon*, 391 U.S. at 522, 88 S.Ct. 1770; *Fleenor*, 514 N.E.2d at 83–84. Those jurors who merely state a broad opposition to the death penalty but nevertheless indicate an ability to follow the law and consider imposition of a death sentence may not be removed for cause. *Witherspoon*, 391 U.S. at 522, 88 S.Ct. 1770; *Fleenor*, 514 N.E.2d at 83.

■ We first observe that defendants generally have sought to preclude the death qualifying of a jury in capital cases on the theory that it improperly excludes jurors who voice opposition to the death penalty. *See, e.g., Wisehart v. State*, 484 N.E.2d 949, 953 (Ind.1985); *Burris v. State*, 465 N.E.2d 171, 177 (Ind.1984); *Hoskins v. State*, 441 N.E.2d 419, 421 (Ind. 1982). With this theory in mind, it is not clear to us how "LWOP" qualifying a jury serves to benefit Logan. In any event trial courts have broad discretionary power in regulating the form and substance of *voir dire*. *Cliver v. State*, 666 N.E.2d 59, 65 (Ind.1996). The decision of the trial court will be reversed only if there is a showing of a manifest abuse of discretion and a denial of a fair trial. *Id.* This will usually require a showing by the defendant that he was in some way prejudiced by the *voir dire*. *Id.*

■ Indiana Trial Rule 47(D) dictates in pertinent part "the court *shall permit* the parties or their attorneys to conduct the examination of prospective jurors, and may conduct examination itself." (emphasis added).[1] In this case the trial court did not permit Logan or his attorney to directly question prospective jurors concerning their views on life without parole. This was error. However, each juror was questioned regarding his or her ability to base a sentencing recommendation on the law and the evidence. The trial court's questioning of the jurors sought to reveal any bias and determine whether the jurors could render a fair and impartial recommendation, which we have held is the purpose of *voir dire*. *See Games v. State*, 535 N.E.2d 530, 538 (Ind.1989).

■ Logan seems to contend that he could better probe into the jurors' beliefs regarding life without parole and better explain the concept, which jurors may have misunderstood. However, Logan does not indicate what questions he would have asked, nor does he explain why the trial court's procedure of asking questions tendered by the parties was inadequate for purposes of empanelling a fair and impartial jury. Further, Logan has failed to show that the trial court's procedure adversely impacted his ability to employ his peremptory challenges or his challenges for cause, and he does not allege that any specific juror should have been removed and was not. "[T]he Constitution presupposes that a jury selected from a fair cross-section of the community is impartial, regardless of the mix of individual viewpoints actually represented on the jury, so long as the jurors can conscientiously and properly carry out their sworn duty to apply the law to the facts of the particular case." *Fleenor*, 514 N.E.2d at 83 (quoting *Lockhart v. McCree*, 476 U.S. 162, 184, 106 S.Ct. 1758, 90 L.Ed.2d 137

1. Rule 47(D) is made applicable to criminal cases through Indiana Criminal Rule 21.

(1986)). We conclude that Logan has not shown that he was prejudiced by the procedure that the trial court used in selecting the jury. Thus, although the trial court erred by not permitting Logan to directly question prospective jurors concerning their views on life without parole, the error was harmless.

### IV. Cross–Examination

Logan next contends that the trial court committed reversible error when it precluded him from cross-examining accomplice and State's witness Jason Harrison regarding Harrison's prior juvenile adjudication. Harrison's juvenile adjudication would have amounted to a car-jacking conviction if he had been an adult.

 A defendant's Sixth Amendment right of confrontation requires that the defendant be afforded an opportunity to conduct effective cross-examination of State witnesses in order to test their believability. *Thornton v. State*, 712 N.E.2d 960, 963 (Ind.1999). However, this right is subject to reasonable limitations imposed at the discretion of the trial judge. *Id.* In *Delaware v. Van Arsdall*, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986), the United States Supreme Court declared:

> It does not follow, of course, that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness. On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.

*Id.* at 679, 106 S.Ct. 1431.

Indiana trial courts are guided by Indiana Evidence Rule 609(d) in placing reasonable limits on the admissibility of juvenile adjudications. That rule provides:

> Evidence of juvenile adjudications is generally not admissible under this rule. The court may, however, in a criminal case allow evidence of a juvenile adjudication of a witness other than the accused if conviction of the offense would be admissible to attack the credibility of an adult and the court is satisfied that admission in evidence is necessary for a fair determination of the issue of guilt or innocence.

The text of the rule makes clear that in most cases evidence of a juvenile adjudication is not admissible to impeach a witness. Even when the offense is otherwise admissible to attack the credibility of an adult, the trial court may exclude the evidence if it is not satisfied that the evidence is necessary for a fair determination of the guilt or innocence of the defendant. Thus, Rule 609(d) leaves the admissibility of a juvenile adjudication to the trial court's discretion, so long as that discretion does not violate the defendant's Sixth Amendment rights.

 Here, the trial court found that evidence of Harrison's juvenile adjudication was not necessary for a fair determination of Logan's guilt or innocence. We cannot disagree with the court's decision. Logan vigorously cross-examined and impeached Harrison regarding lies that Harrison told police, his involvement in Riebersol's robbery and murder, and Harrison's possible bias associated with the plea agreement he reached with the State. Nevertheless, Logan contends that the adjudication was necessary for a fair determination of guilt or innocence in this case because it would have shed more light on Harrison's plea agreement with the State. Logan implies that admission of the juvenile adjudication would have shown an extra incentive for Harrison to enter a plea agreement and testify against Logan.

To support his claim, Logan cites *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). In that case the defendant attempted to show a witness's potential bias and prejudice by introducing

evidence of the witness's probationary status stemming from a juvenile adjudication. The defense wanted to show that the witness's fear of probation revocation may have influenced the witness's testimony. The trial court in *Davis* precluded the defendant from introducing the evidence. The Supreme Court held that the trial court's exclusion of the impeachment evidence violated the defendant's rights under the Sixth Amendment's confrontation clause. *Id.* at 317–18, 94 S.Ct. 1105. However, unlike this case, in *Davis* the trial court's decision not to allow the introduction of a witness's juvenile adjudication precluded the defendant from presenting any evidence of bias. *Id.* Such is not the case here. Logan was able to present evidence of Harrison's alleged bias to the jury. We fail to see how this alleged extra incentive was necessary for a fair determination of guilt or innocence. The jury was aware that Harrison received favorable treatment from the State in exchange for his testimony against Logan. The juvenile adjudication would have added little, if anything, to Logan's impeachment of Harrison. We conclude the trial court did not abuse its discretion in limiting Logan's cross-examination of Harrison.

## V. Impeachment

Logan filed a motion *in limine* seeking to preclude the State from impeaching him with a prior burglary conviction in Illinois. The trial court denied Logan's motion. Logan argued at trial that the State failed to show the Illinois conviction occurred when Logan was an adult. Logan claimed that the conviction sheet that the State sought to use in impeaching him indicated that Logan was only seventeen years old at the time of the conviction. The trial court examined the document and found that it did not indicate that the conviction was anything other than an adult conviction for burglary. As a result, the court allowed the State to use the conviction to impeach Logan. Logan renews his claim on appeal.

■ Our review of the record reveals that the conviction sheet was never admitted as evidence, and therefore it is not in the record of proceedings. Thus, it is impossible for us to review Logan's claim that the face of the document indicates the conviction was actually a juvenile adjudication. Given the record before us, we cannot say the trial court abused its discretion in denying Logan's motion *in limine.*

## VI. Sufficiency of the Evidence

Logan also contends that the State failed to present sufficient evidence to support his convictions for murder and robbery. In reviewing a sufficiency of the evidence claim, we do not reweigh the evidence or assess the credibility of the witnesses. *Soward v. State,* 716 N.E.2d 423, 425 (Ind.1999). Rather, we look to the evidence and reasonable inferences drawn therefrom that support the verdict, and we will affirm the convictions if there is probative evidence from which a reasonable jury could have found the defendant guilty beyond a reasonable doubt. *Kelly v. State,* 719 N.E.2d 391, 394 (Ind.1999).

■ The evidence presented at trial was more than adequate to sustain Logan's convictions. Poff testified that she saw Logan strike Riebersol in the head with a gun and then fire the shots that struck and killed Riebersol. Poff also watched as an armed Logan took money from Riebersol's pocket after Riebersol collapsed outside the apartment. Further, accomplice Jason Harrison testified that only Logan had a gun that evening and after the robbery Logan placed the gun under a cushion in Cunegin's couch and bragged about shooting Riebersol. Accomplice Orlando Johnson also testified that he saw Logan place a gun under a cushion in the couch after the shooting. Evidence presented at trial confirmed that the gun Logan placed in Cunegin's couch was used in the Riebersol killing. In addition, both accomplices described how the group planned and executed the robbery. Logan's argument amounts to an invitation

for this Court to reweigh the evidence. We decline.

## VII. Sentencing

Logan challenges his sentence of life without parole contending there was insufficient evidence for the jury to recommend and for the court to find that the aggravating circumstances outweighed the mitigating factors. To obtain a sentence of life without parole, the State must prove beyond a reasonable doubt the existence of one or more aggravating circumstances listed in Ind.Code § 35–50–2–9(b). *Monegan v. State*, 721 N.E.2d 243, 256 (Ind. 1999). In this case the State relied on Ind.Code § 35–50–2–9(b)(1)(G) which provides that it is an aggravating circumstance where "[t]he defendant committed the murder by intentionally killing the victim while committing or attempting to commit ... Robbery." This statutory aggravator was proven beyond a reasonable doubt. The mitigating factors considered by the trial court were: Logan's background of a broken home, his lack of a father figure, his sexual abuse by a scout leader, the death of his grandmother, and Logan's drug and alcohol dependence. Logan argues the trial court erred in weighing these factors. According to Logan, in light of the mitigating factors, without more evidence of aggravating circumstances, the appropriate sentence in this case is a term of years. We disagree.

Several mitigating factors may be outweighed by one aggravating factor. *McIntyre v. State*, 717 N.E.2d 114, 127 (Ind.1999). Here, the trial court complied with the procedure prescribed by Ind.Code § 35–50–2–9. The trial court considered the recommendation of the jury, found the State had proven at least one aggravating factor beyond a reasonable doubt, and weighed the applicable mitigating and ag-

gravating factors. His sentencing decision was based upon the reasonable recommendation of the jury and his own specific findings. On this issue we find no error.

However, we do address one issue *sua sponte*, namely the trial court's error in sentencing Logan for robbery as a Class A felony. In *Richardson v. State*, 717 N.E.2d 32 (Ind.1999), we developed a two-part test for determining whether two convictions are permissible under Indiana's double jeopardy clause. *Id.* at 49. A double jeopardy violation occurs when "the State ... proceed[s] against a person twice for the same criminal transgression." *Hampton v. State*, 719 N.E.2d 803, 809 (Ind.1999) (quoting *Richardson*, 717 N.E.2d at 49). Under *Richardson*, "two or more offenses are the 'same offense' ... if, with respect to *either* the statutory elements of the challenged crimes *or* the actual evidence used to convict, the essential elements of one challenged offense also establish the essential elements of another challenged offense." *Id.*

When we look to the actual evidence presented at trial, we will reverse one of the convictions if there is "a reasonable possibility that the evidentiary facts used by the fact-finder to establish the elements of one offense may also have been used to establish the elements of a second challenged offense." *Richardson*, 717 N.E.2d at 53. In the case before us, the record is clear the same evidence that supported Logan's murder conviction was also used to elevate Logan's robbery conviction to a Class A felony. Robbery is a Class A felony if it results in serious bodily injury. The serious bodily injury alleged and proven by the State in this case was Riebersol's death, the same fact used to convict Logan of murder. Thus, under *Richardson*, Logan's conviction of Class A robbery cannot stand.[2]

---

2. Even before *Richardson,* this Court held that "where a single act forms the basis both for the upgrade, from Class C to Class A, of the robbery conviction and also the act element of the murder charge, a defendant can-

not be twice sentenced for committing this single act. To do so would violate the prohibition against double jeopardy." *Kingery v. State,* 659 N.E.2d 490, 495–96 (Ind.1995).

However, this does not entitle Logan to escape conviction and punishment for the robbery of which he was convicted. There are three felony classes of robbery:

A person who knowingly or intentionally takes property from another person or from the presence of another person: (1) by using or threatening the use of force on any person; or

(2) by putting any person in fear;

commits robbery, a Class C felony. However, the offense is a Class B felony if it is committed while armed with a deadly weapon or results in bodily injury to any person other than a defendant, and a Class A felony if it results in serious bodily injury to any person other than the defendant.

Ind.Code § 35–42–5–1. Robbery as a Class C felony is a lesser-included offense of robbery as a Class A felony as charged in the State's information. *See Kingery v. State,* 659 N.E.2d 490, 495 (Ind.1995). Robbery as a Class B felony, however, is not necessarily a lesser-included offense of robbery as a Class A felony. *See id.* Here, the State did not allege the use of a deadly weapon as an enhancement of the offense, and as such, Class B robbery is not lesser included on that basis. Robbery resulting in bodily injury as a Class B felony may be a lesser included offense of Robbery as a Class A felony in this case. However, as stated above, the only injury alleged by the State in this case was Riebersol's death. Elevation of the offense to a Class B felony on the basis of bodily injury poses the same double jeopardy problem as does Logan's conviction for robbery resulting in serious bodily injury as a Class A felony. Thus, the proper remedy for the violation of Logan's right to be free from double jeopardy is to vacate that part of Logan's robbery conviction that elevated his offense to a Class A felony and reduce his robbery conviction to a Class C felony. *See Wise v. State,* 719 N.E.2d 1192, 1201 (Ind.1999); *Hampton,* 719 N.E.2d at 809; *Kingery,* 659 N.E.2d at 496. Accordingly, Logan's conviction for robbery as a Class A felony must be vacated.

## CONCLUSION

We remand this cause to the trial court with instructions to reduce Logan's robbery conviction to a Class C felony and to re-sentence Logan accordingly. In all other respects the judgment of the trial court is affirmed.

SHEPARD, C.J., and DICKSON, SULLIVAN and BOEHM, JJ., concur.