

FILED

Nov 30 2020, 9:42 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Mark A. Bates
Office of Lake County Public Defender
Crown Point, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Courtney Staton
Deputy Public Defender
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Damonta Lamont Jarrett, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | November 30, 2020 <br><br> Court of Appeals Case No. <br> 20A-CR-59 <br><br> Appeal from the Lake Superior Court <br><br> The Honorable Diane Ross Boswell, Judge <br><br> Trial Court Cause No. <br> 45G03-1611-MR-7 |

**Pyle, Judge.**

# Statement of the Case

Damonta Lamont Jarrett ("Jarrett") appeals his convictions, following a jury trial, of murder[1] and Level 5 felony attempted robbery[2] and the sentence imposed thereon. He argues that: (1) his convictions for murder and Level 5 felony attempted robbery violate Indiana's prohibition against double jeopardy; (2) the trial court abused its discretion when it denied his two separate motions for mistrials; and (3) the trial court erred in sentencing him. Finding no double jeopardy violation, no abuse of the trial court's discretion, and no sentencing error, we affirm Jarrett's convictions and sentence.

We affirm.

# Issues

1.  Whether Jarrett's convictions for murder and Level 5 felony attempted robbery violate Indiana's prohibition against double jeopardy.

2.  Whether the trial court abused its discretion when it denied Jarrett's two separate motions for mistrial.

3.  Whether the trial court erred in sentencing Jarrett.

---

[1] IND. CODE § 35-42-1-1.

[2] I C. §§ 35-42-5-1 and 35-41-5-1.

## Facts

[3] In October 2016, forty-year-old Steven Marquand ("Marquand") lived in a rented room in Gary, Indiana, with his fiancée, Kelly Worley ("Worley"). On October 18, Worley spent the day cleaning a friend's house. The friend paid Worley with a can of change. That evening, Marquand and Worley cashed in the coins at a local currency exchange. After paying fees, Marquand and Worley received $283 in cash, which included two one-hundred-dollar bills. Marquand folded the cash and placed it in his pocket.

[4] Marquand and Worley then purchased a carry-out dinner and drove to a nearby gas station convenience store. Marquand went into the store to purchase drinks and ice and paid for the items with the cash. Twenty-three-year-old Jarrett, who was in the convenience store when Marquand paid for the drinks and ice, apparently saw Marquand pull the cash out of his pocket.

[5] Marquand left the convenience store, and Jarrett followed him. As Marquand was getting into his car, Jarrett approached him with a gun and told Marquand "to give [him] the money or [he would] shoot." (Tr. Vol. 3 at 157). When Marquand, who was sitting in the driver's seat of his car by this point, responded, "no[,]" Jarrett shot Marquand in the chest. (Tr. Vol. 3 at 158).

[6] Marquand drove the car out of the gas station, looked at Worley, and said, "[b]aby, I'm shot, I'm shot." (Tr. Vol. 3 at 161). Marquand's eyes rolled back, and Worley, who had been sitting in the passenger seat, jumped into Marquand's lap and attempted to gain control of the car. Worley side-swiped a fence, which

slowed the car down, and she was subsequently able to stop it. Marquand died as a result of the gunshot wound.

[7] In November 2016, the State charged Jarrett with both murder and felony murder (murder while attempting to commit a robbery). Jarrett was taken into custody in May 2017. In September 2019, the State amended the charging information to include a charge for Level 5 felony attempted robbery and a firearm enhancement for each of the three counts.

[8] At the four-day trial in October and November 2019, forensic pathologist Dr. Zhuo Wang ("Dr. Wang") testified that a bullet had entered Marquand's chest and passed through his heart, lung, and esophagus before exiting through his back. According to Dr. Wang, the cause of Marquand's death was the gunshot wound to the chest, and the manner of Marquand's death was a homicide.

[9] Gary Police Department Homicide Investigator George Dickerson ("Investigator Dickerson") also testified at the trial. According to Investigator Dickerson, "the earliest date that [he] could have submitted anything for DNA testing" of Jarrett was in May 2017, which was "the first time that the Gary Police Department [had been] able to make contact with [Jarrett]." (Tr. Vol. 4 at 154). Jarrett's trial counsel asked to approach the bench and told the trial court that Investigator Dickerson's testimony "suggest[ed] that they couldn't find [Jarrett] because he wasn't around." (Tr. Vol. 4 at 154). Trial counsel further told the trial court that he did not "want any inference made that w[ould] inflame - -" (Tr. Vol. 4 at 154). The prosecutor responded that he "ha[d] no evidence of flight, just that they

couldn't test anything until they found him." (Tr. Vol. 4 at 154). According to the prosecutor, trial counsel had made "a preemptive objection." (Tr. Vol. 4 at 155). That was the end of the discussion at the bench.

[10] Thereafter, Investigator Dickerson testified that by May 2017, the police "had already positively identified [Jarrett][.]" (Tr. Vol. 4 at 155). Investigator Dickerson further agreed with the prosecutor that "with a positive identification that had been corroborated . . . a dozen times over, [Investigator Dickerson] did [not] . . . feel the need to submit anything for DNA testing to identify the individual at the gas station." (Tr. Vol. 4 at 157). When asked if he had "ma[d]e the call not to do that[,]" Investigator Dickerson responded that "from protocol, we can't do that until he's actually taken into custody." (Tr. Vol. 4 at 157).

[11] Jarrett's trial counsel again asked to approach the bench and moved for a mistrial "based on the fact that [Investigator Dickerson had] stated that [Jarrett] would have been brought into custody and we have a [seven-month] delay from the time of the incident to when he [was] taken into custody, which again, asserts the flight."[3] (Tr. Vol. 4 at 157-58). The trial court denied the motion, and trial counsel did not ask for a limiting instruction.

___

[3] Trial counsel argued at trial that there was "a year and a half delay from the time of the incident to when he [was] taken into custody[.]" (Tr. Vol. 4 at 157-58). However, the murder occurred in October 2016, and Jarrett was taken into custody in May 2017. There was therefore a seven-month delay from the time of the murder to when Jarrett was taken into custody. Trial counsel's confusion may have been based on Investigator Dickerson's initial testimony that Jarrett had been taken into custody in May 2018. (Tr. Vol. 4 at 153). However, Investigator Dickerson immediately apologized and testified that Jarrett had been taken into custody in May 2017. (Tr. Vol. 4 at 154). In addition, the trial court's Chronological Case Summary

[12] After the State had finished questioning Investigator Dickerson, the trial court judge advised the parties that there would be a fifteen-minute recess. Following the recess, the trial court judge asked the prosecutor and trial counsel to approach the bench. The trial court judge told the attorneys that while she was in the courtroom during the recess, Jarrett had told her, "[y]our birthday's coming up, and I just wanted to wish you a happy birthday." (Tr. Vol. 4 at 161). The trial court judge further told the attorneys that she had asked Jarrett how he knew when her birthday was, and Jarrett had responded that "everybody's birthday is coming up, whether it's past or in the future, somebody is going to have a birthday." (Tr. Vol. 4 at 162). The trial court judge explained that the comment had made her uncomfortable, and she was "not sure what to do about it." (Tr. Vol. 4 at 162). The trial court judge further explained that she had asked Jarrett when her birthday was, and the bailiff had heard Jarrett say that the trial court judge's birthday was "in a couple of months." (Tr. Vol. 4 at 163). The trial court judge told the attorneys that her birthday was in January, which, at the time of the trial, was two months away.

[13] Based upon Jarrett's comments and the trial court judge's discomfort, trial counsel asked the trial court judge to declare a mistrial. The prosecutor asked the trial court judge "in what way d[id] that impact [Jarrett's] ability to have a fair trial" and if she could "still listen to this case fairly, adjudge the law fairly[,] and sentence

states that Jarrett was taken into custody on May 19, 2017 and that his initial hearing was held that same day.

fairly." (Tr. Vol. 4 at 165). The trial court judge responded that she certainly could but that she wanted to "take a few more minutes while we give 15 and think about it." (Tr. Vol. 4 at 165). The trial court judge further explained that she was not concerned about "over-sentencing him or doing anything like that because he [had] made that comment." (Tr. Vol. 4 at 166). Rather, her concern was her safety and why Jarrett "f[elt] it necessary to say that to [her]." (Tr. Vol. 4 at 166).

[14] Twenty minutes later, Jarrett returned to the courtroom, and the trial court judge stated that she had discussed his comments about her birthday with the prosecutor and his trial counsel. The trial court judge further told Jarrett that "[t]he question was posed to [her] whether or not [she] thought [she] could still be fair and impartial based on [her] concern about the comment." (Tr. Vol. 4 at 169). The trial court judge stated that she could still be fair and impartial and that Jarrett's comments would not affect any ruling that she had to make in the case or any sentence should he be convicted. The trial court judge further told Jarrett that "when [he had] information like that, [he] need[ed] to keep it to [him]self[,]" and denied his motion for a mistrial. (Tr. Vol. 4 at 169). The jury was not present for any of the discussion regarding Jarrett's birthday remarks to the trial court judge.

[15] At the end of the four-day trial, Jarrett's trial counsel renewed his motion for a mistrial "based on the testimony of [Investigator] Dickerson and the fact that at some point, [his] client [had been] taken into custody." (Tr. Vol. 5 at 4). Trial counsel specifically argued as follows:

> I do believe that's extremely prejudicial, and the jury heard the
> fact that at some point, he was brought into custody in this case

and essentially arrested or taken to the jail. The fact that that testimony was heard by the members of the jury, I think, it is too prejudicial to overcome, and based on some of the questions they asked following [Investigator] Dickerson's testimony, I do think it's something that has infiltrated the jury panel, so at this point, I would just renew our motion for a mistrial based on that testimony.[4]

(Tr. Vol. 5 at 4).

[16] The trial court denied the motion and asked trial counsel if he "ha[d] some kind of curative statement for the . . . motion." (Tr. Vol. 5 at 6). During a bench conference, the parties discussed the language that should be included in a limiting instruction and agreed that the trial court would instruct the jury that "[t]he fact that the defendant may have been taken into custody is not proof of guilt and should not be taken into consideration during your deliberations." (Tr. Vol. 5 at 6-8; App. Vol. 2 at 118). When the trial court asked trial counsel if the instruction was "[g]ood[,]" trial counsel responded that the instruction was "[p]erfect." (Tr. Vol. 5 at 8).

[17] The jury convicted Jarrett of murder, felony murder (murder while attempting to commit a robbery), and Level 5 felony attempted robbery. In a separate proceeding, Jarrett admitted that he had used a firearm while committing each of the three offenses.

---

[4] Apparently two jurors submitted written questions asking when Jarrett was taken into custody. These questions were not posed to Investigator Dickerson.

[18] At the December 2019 sentencing hearing, the State presented evidence that Jarrett was on probation for another robbery offense at the time he murdered Marquand. During that offense, Jarrett "saw a man carrying a handgun with a permit and decided to attempt to take that gun from that man's person." (Sentencing Hearing Tr. Vol. 2 at 17). In addition, the State presented evidence that, at the time of his arrest for Marquand's murder, Jarrett "was wanted on the original warrant for a separate armed robbery, the allegations for which include[d] holding a gun to an infant's head to threaten a mother to turn over money in a home invasion." (Sentencing Hearing Tr. Vol. 2 at 15-16). The State also pointed out that although Jarrett's criminal history included just one felony, "part of the reason for that [was] that he [had been] able to evade justice for more than two years with the original warrant for that robbery [described above], and in this instant case, although he was charged in November of 2016, he wasn't arrested until May of 2017." (Sentencing Hearing Tr. Vol. 2 at 16).

[19] At the end of the sentencing hearing, the trial court found the following aggravating factors: (1) Jarrett's prior felony conviction; (2) the nature and circumstances of the offense, which "was a crime of opportunity, spur of the moment, he just saw it and did it[;]" and (3) Jarrett was on probation at the time he murdered Marquand. (Sentencing Hearing Tr. Vol. 2 at 27). The trial court considered Jarrett's age to be a mitigating factor.

[20] Thereafter, the trial court vacated Jarrett's felony murder (murder while attempting to commit a robbery) conviction. The trial court sentenced Jarrett to an enhanced fifty-seven (57) year sentence for the murder conviction and a three (3) year

advisory sentence for the Level 5 felony attempted robbery conviction. The trial court further enhanced Jarrett's three-year sentence for the attempted robbery conviction by five (5) years because Jarrett used a firearm during the attempted robbery. The trial court then ordered the fifty-seven (57) year sentence for murder to run consecutively to the enhanced eight (8) year sentence for Level 5 felony attempted robbery, for a total executed sentence of sixty-five (65) years.

[21] Jarrett now appeals his convictions and sentence.

# Decision

[22] Jarrett argues that: (1) his convictions for murder and Level 5 felony attempted robbery violate Indiana's prohibition against double jeopardy; (2) the trial court abused its discretion when it denied his two separate motions for mistrials; and (3) the trial court erred in sentencing him. We address each of his contentions in turn.

## 1. Double Jeopardy

[23] Jarrett first argues that his convictions for murder and Level 5 felony attempted robbery violate Indiana's prohibition against double jeopardy under the actual evidence test established by our supreme court in *Richardson v. State*, 717 N.E.2d 32 (Ind. 1999). However, while Jarrett's case was pending on appeal, the Indiana Supreme Court "expressly overrule[d] the *Richardson* constitutional tests in resolving claims of substantive double jeopardy" and adopted an analytical framework to be applied where, as here, "a single criminal act or transaction

violates multiple statutes (rather than a single statute)[.]" *Wadle v. State*, 151 N.E.3d 227, 235 (Ind. 2020).[5]

[24] Our supreme court summarized the *Wadle* analytical framework as follows:

> [W]hen multiple convictions for a single act or transaction implicate two or more statutes, we first look to the statutes themselves. If either statute clearly permits multiple punishment, whether expressly or by unmistakable implication, the court's inquiry comes to an end and there is no violation of substantive double jeopardy. But if the statutory language is not clear, then a court must apply our included-offense statutes to determine whether the charged offenses are the same. *See* [IND. CODE] § 35-31.5-2-168. If neither offense is included in the other (either inherently or as charged), there is no violation of double jeopardy. But if one offense is included in the other (either inherently or as charged), then the court must examine the facts underlying those offenses, as presented in the charging instrument and as adduced at trial. If, based on these facts, the defendant's actions were "so compressed in terms of time, place, singleness of purpose, and continuity of action as to constitute a single transaction," then the prosecutor may charge the offenses as alternative sanctions only. But if the defendant's actions prove otherwise, a court may convict on each charged offense.

*Wadle*, 151 N.E.3d at 253.

[25] Applying the *Wadle* analytical framework to the facts of this case, we note that Jarrett was convicted of murder pursuant to INDIANA CODE § 35-42-1-1, which

---

[5] *Powell v. State*, 151 N.E.3d 256, 263 (Ind. 2020), on the other hand, established the framework to be applied "when a single criminal act or transaction violates a single statute and results in multiple injuries."

provides that "[a] person who: knowingly or intentionally kills another human being . . . commits murder, a felony." Jarrett was also convicted of Level 5 felony attempted robbery. The relevant statutes are INDIANA CODE §§ 35-42-5-1 and 35-41-5-1. INDIANA CODE § 35-42-5-1 provides that "a person who knowingly or intentionally takes property from another person or from the presence of another person: (1) by using or threatening the use of force on any person; or (2) by putting any person in fear; commits robbery, a Level 5 felony." INDIANA CODE § 35-41-5-1 provides that "[a] person attempts to commit a crime when, acting with the culpability required for commission of the crime, the person engages in conduct that constitutes a substantial step toward commission of the crime." These statutes do not clearly permit multiple punishments, either expressly or by unmistakable implication.

[26] With no statutory language clearly permitting multiple punishments, we move to the second step of the analysis: determining whether either offense is included in the other ("either inherently or as charged") under the included offense statute, INDIANA CODE § 35-31.5-2-168. *See Wadle*, 151 N.E.3d at 227. If not, there can be no double jeopardy. *See id*.

[27] INDIANA CODE § 35-31.5-2-168 defines "included offense" as an offense that:

> (1) is established by proof of the same material elements or less than all the material elements required to establish the commission of the offense charged;
>
> (2) consists of an attempt to commit the offense charged or an offense otherwise included therein; or

(3) differs from the offense charged only in the respect that a less serious harm or risk of harm to the same person, property, or public interest, or a lesser kind of culpability, is required to establish its commission.

[28] Subsection (1) is not implicated here. Murder is not established by proof of Level 5 felony robbery because murder requires a killing and Level 5 felony attempted robbery does not. In addition, Level 5 felony attempted robbery is not established by proof of murder because attempted robbery requires a substantial step toward the taking of property and murder does not.

[29] Subsection (2) also does not apply here. Pursuant to the statute, an attempt crime is an included offense of the completed crime. *Ledesma v. State*, 761 N.E.2d 896, 899 (Ind. Ct. App. 2002) (citing *State el rel. Camden v. Gibson Circuit Court*, 640 N.E.2d 696, 701 (Ind. 1994) and INDIANA CODE § 35-41-1-16(2), a prior version of the included offense statute that also defined an included offense as one that "consists of an attempt to commit the offense charged or an offense otherwise included therein")). *See also* INDIANA CODE § 35-41-5-3 (stating that "[a] person may not be convicted of both a crime and an attempt to commit the same crime"). Here, Jarrett was convicted of murder but not attempted murder and Level 5 felony attempted robbery but not Level 5 felony robbery.

[30] Lastly, subsection (3) does not apply here. This is because murder and Level 5 felony attempted robbery differ in more respects than just the degree of harm of culpability required. Specifically, murder requires a killing and Level 5 felony attempted robbery requires a substantial step toward the taking of property.

Because neither murder nor Level 5 felony attempted robbery is included in the other, Jarrett's convictions do not constitute double jeopardy under *Wadle*. *See Diaz v. State*, 2020 WL 5858609 (Ind. Ct. App. Oct. 2, 2020) (holding that Diaz's convictions for murder and Level 5 felony robbery did not constitute double jeopardy under *Wadle*). We therefore need not further examine the specific facts of the case under the third step of the *Wadle* analytical framework. *See id*.

### 2. Motions for Mistrial

Jarrett next argues that the trial court abused its discretion when it denied his two separate motions for mistrials. The denial of a motion for a mistrial rests within the sound discretion of the trial court, and we review the trial court's decision only for an abuse of discretion. *Brittain v. State*, 68 N.E.3d 611, 619 (Ind. Ct. App. 2017), *trans. denied*. The trial court is entitled to great deference on appeal because the trial court is in the best position to evaluate the relevant circumstances of a given event and its probable impact on the jury. *Id*. at 620. To prevail on appeal from the denial of a motion for mistrial, a defendant must demonstrate that the statement in question was so prejudicial that he was placed in a position of grave peril. *Id*. The gravity of the peril is measured by the challenged conduct's probable persuasive effect on the jury's decision, not the impropriety of the conduct. *Mickens v. State*, 742 N.E.2d 927, 929 (Ind. 2001). The question is not whether the absence of this persuasive effect would lead to an acquittal instead of a conviction, but rather whether "the evidence is close and the trial court fails to alleviate the prejudicial effect." *Everroad v. State*, 571 N.E.2d 1240, 1244 (Ind. 1991). Granting a mistrial "is an extreme remedy that is warranted only when no other action can

be expected to remedy the situation." *Kemper v. State*, 35 N.E.3d 306, 309 (Ind. Ct. App. 2015), *trans. denied*.

[33] Jarrett first contends that the trial court abused its discretion when it denied his motion for a mistrial regarding Investigator Dickerson's testimony that he had not submitted Jarrett's DNA for analysis because such testing is not feasible until a suspect is taken into custody. Jarrett argues that based on this testimony, jurors "may have been wondering about whether Jarrett took flight after the killing of Marquand." (Jarrett's Br. 22). Jarrett further argues that "where the jury was left with this mistaken impression, and the trial court did not admonish them, let alone grant the motion for mistrial, [he] was put in grave peril and his convictions should be reversed." (Jarrett's Br. 22).

[34] First, we agree with the State that "Jarrett has failed to demonstrate any prejudice other than his speculative and self-serving statement that this testimony may have left the jury 'wondering about whether Jarrett took flight after the killing of Marquand.'" (State's Br. 19). Investigator Dickerson's testimony did not place Jarrett in grave peril, and the trial court did not abuse its discretion in denying his motion for a mistrial. *See Hill v. State*, 137 N.E.3d 926, 941 (Ind. Ct. App. 2019) (stating that the trial court did not abuse its discretion in denying the defendant's motion for a mistrial where the defendant "ha[d] failed to demonstrate any prejudice other than his speculative and self-serving statement that [an officer's] testimony likely impacted the jury's impression of [the defendant]"), *trans. denied*.

[35] We further note that although Jarrett argues that the trial court did not admonish the jury, our review of the record reveals that the trial court did give the jury a limiting instruction. Specifically, the trial court instructed the jury that "[t]he fact that the defendant may have been taken into custody is not proof of guilt and should not be taken into consideration during your deliberations." (Tr. Vol. 5 at 6-8; App. Vol. 2 at 118). In addition, Jarrett's trial counsel told the trial court that the instruction was "[p]erfect." (Tr. Vol. 5 at 8).

[36] Thus, even if Investigator Dickerson's testimony had placed Jarrett in grave peril, the trial court's limiting instruction would have dispelled it and justified the denial of Jarrett's motion. *See Banks v. State*, 761 N.E.2d 403, 405 (Ind. 2002) (finding that the trial court's admonishment to the jury to disregard a witness' remark about the defendant's prior unrelated criminal act sufficiently dispelled any grave peril and justified denial of the defendant's motion for a mistrial). The trial court did not abuse its discretion in denying Jarrett's motion for a mistrial regarding Investigator Dickerson's testimony.[6]

[37] Jarrett also contends that the trial court abused its discretion when it denied his motion for a mistrial after Jarrett wished the trial court judge a happy birthday. Jarrett specifically argues that "the judge's comments that she was uncomfortable,

---

[6] In his reply brief, Jarrett acknowledges that the trial court gave the jury a limiting instruction and argues that the instruction "did not address [trial] counsel's concern[.]" (Jarrett's Reply Br. 9). However, trial counsel told the trial court that the instruction was "[p]erfect." (Tr. Vol. 5 at 8). Further, a party cannot raise an issue for the first time in a reply brief. *Curtis v. State*, 948 N.E.2d 1143, 1148 (Ind. 2011).

even though she said she could be fair, placed Jarrett in grave peril." (Jarrett's Br. 23).

[38] However, as stated above, "[t]he gravity of the peril is measured by the probable persuasive effect of the statement *on the jury*." *Smith*, 140 N.E.3d at 373. (emphasis added). Here, the trial court judge's statements about Jarrett's birthday remarks were made outside the presence of the jury and could have had no persuasive effect on the members of the jury. The trial court did not abuse its discretion in denying Jarrett's motion for a mistrial after Jarrett wished the trial court judge a happy birthday.[7]

### 3. Sentence

[39] Lastly, Jarrett argues that the trial court erred in sentencing him. Jarrett specifically contends that: (1) the trial court abused its discretion when it imposed consecutive sentences for his murder and attempted robbery convictions; and (2) the trial court improperly applied INDIANA CODE § 35-50-2-11 ("the Firearm Enhancement Statute") to enhance his sentence for attempted robbery for using a

---

[7] In a related cursory argument, without citation to authority, Jarrett contends that "the fact that [the trial court judge] was uncomfortable and apparently felt threatened indicates that she could no longer be unbiased and unprejudiced after Jarrett made the unsolicited and unwelcomed remarks to her." (Jarrett's Br. 23). However, the law presumes that a judge is unbiased and unprejudiced. *Garland v. State*, 788 N.E.2d 425, 433 (Ind. 2003). "To rebut that presumption, the defendant 'must establish from the judge's conduct actual bias or prejudice that places the defendant in jeopardy.'" *Perry v. State*, 904 N.E.2d 302, 307 (Ind. Ct. App. 2009) (quoting *Smith v. State*, 770 N.E.2d 818, 823 (Ind. 2002)), *trans. denied*. Jarrett has failed to allege or establish any such bias or prejudice that placed him in jeopardy, and we find no error.

firearm in the commission of the offense. We address each of his contentions in turn.

[40] Jarrett first argues that the trial court abused its discretion when it imposed consecutive sentences for his murder and attempted robbery convictions. Sentencing decisions rest within the sound discretion of the trial court. *Anglemyer v. State*, 868 N.E.2d 482, 490 (Ind. 2007), *clarified on reh'g*, 875 N.E.2d 218 (Ind. 2007). So long as the sentence is in the statutory range, it is subject to review only for an abuse of discretion. *Id.* An abuse of discretion occurs if the decision is clearly against the logic and effect of the facts and circumstances before the court or the reasonable, probable, and actual deductions to be drawn therefrom. *Id.* at 491. A trial court may abuse its discretion in a number of ways, including: (1) failing to enter a sentencing statement at all; (2) entering a sentencing statement that includes aggravating and mitigating factors that are unsupported by the record; (3) entering a sentencing statement that omits reasons that are clearly supported by the record; or (4) entering a sentencing statement that includes reasons that are improper as a matter of law. *Id.* at 490-91.

[41] Jarrett specifically contends that the trial court abused its discretion when it ordered his sentences for murder and attempted robbery to be served consecutively to each other because "[t]here is no statement of the reasons why the trial court ordered the sentences to be served consecutively[.]" (Jarret's Br. 19). Jarrett appears to believe that the trial court was required to state separate reasons for imposing the enhanced sentences for murder and attempted robbery and for ordering the sentences to be served consecutively. He is mistaken.

[42] The Indiana Supreme Court has explained that "there is neither any prohibition against relying on the same aggravating circumstances both to enhance a sentence and to order it served consecutively, nor any requirement that the trial court identify the factors that supported the sentence enhancement separately from the factors that supported consecutive sentences." *Blanche v. State*, 690 N.E.2d 709, 716 (Ind. 1998).

[43] Here, the trial court found three aggravating factors at the sentencing hearing: (1) Jarrett's prior felony conviction; (2) the nature and circumstances of the offense, which "was a crime of opportunity, spur of the moment, he just saw it and did it[;]" and (3) Jarrett was on probation at the time he murdered Marquand. (Sentencing Tr. Vol. 2 at 27). These aggravating factors support the imposition of Jarrett's enhanced and consecutive sentences, and the trial court was not required to restate them in support of its imposition of consecutive sentences. *See id*. Accordingly, the trial court did not abuse its discretion in imposing consecutive sentences for Jarrett's murder and attempted robbery convictions.

[44] Jarrett further contends that the trial court improperly applied the Firearm Enhancement Statute to enhance his sentence for attempted robbery for using a firearm in the commission of the offense. As we stated in *Howell v. State*, 97 N.E.3d 253, 266 (Ind. Ct. App. 2018), *trans. denied*, this argument raises a question of statutory interpretation.

> When interpreting a statute, our primary goal is to fulfill the legislature's intent. [T]he best evidence of that intent is the statute's language. If that language is clear and unambiguous,

we simply apply its plain and ordinary meaning, heeding both what it does say and what it does not say.

*Id*. at 267 (quoting *Mi.D. v. State*, 57 N.E.3d 809, 812 (Ind. 2016) (citations and quotation marks omitted)).

[45] The Firearm Enhancement Statute provides as follows:

> (b) As used in this section, "offense" means:
>
>> (1) a felony under IC 35-42 that resulted in death or serious bodily injury;
>>
>> (2) kidnapping;
>>
>> (3) criminal confinement as a Level 2 or Level 3 felony.
>
>        \*      \*      \*      \*      \*
>
> (d) The state may seek, on a page separate from the rest of a charging instrument, to have a person who allegedly committed an offense sentenced to an additional fixed term of imprisonment if the state can show beyond a reasonable doubt that the person knowingly or intentionally used a firearm in the commission of the offense.
>
>        \*      \*      \*      \*      \*
>
> (g) If the jury (if the hearing is by jury) or the court (if the hearing is to the court alone) finds that the state has proved beyond a reasonable doubt that the person knowingly or intentionally used a firearm in the commission of the offense under subsection (d), the court may sentence the person to an additional fixed term of imprisonment of between five (5) and twenty (20) years.
>
>        \*      \*      \*      \*      \*

> (i) *A person may not be sentenced under subsections (g) and (h)[8] for offenses, felonies, and misdemeanors comprising a single episode of criminal conduct.*

INDIANA CODE § 35-50-2-11.  (emphasis added).

[46] Jarrett does not dispute that his attempted robbery conviction qualifies as an "offense" for the purposes of the Firearm Enhancement Statute pursuant to subsection (b).  Rather, his sole argument is that pursuant to subsection (i), the statute cannot be applied to him because his offenses constitute a single episode of criminal conduct.  In other words, Jarrett interprets subsection (i) to bar a sentencing enhancement for an offense when that offense was committed with other offenses comprising a single episode of criminal conduct.

[47] We addressed this issue in *Howell*, 97 N.E.3d at 267.  Therein, a jury convicted Howell of voluntary manslaughter, attempted robbery, and auto theft.  Howell admitted that he had used a firearm in the commission of voluntary manslaughter. The trial court sentenced Howell to twenty-five years for his voluntary manslaughter conviction, enhanced by fifteen years for using a firearm in the commission of the offense.  The trial court also sentenced Howell to fifteen years for his attempted robbery conviction and two years for his auto theft conviction.

[48] On appeal, Howell did not dispute that his voluntary manslaughter conviction qualified as an "offense" for the purposes of the Firearm Enhancement Statute

---

[8] Subsection (h) deals with pointing and discharging a firearm in the commission of felonies and misdemeanors against police officers.

pursuant to subsection (b). *Id*. Rather, he argued that the statute could not be applied to him because his offenses constituted a single episode of criminal conduct. In other words, Howell, like Jarrett, interpreted subsection (i) to bar a sentencing enhancement for an offense when that offense was committed with other offenses comprising a single episode of criminal conduct. We disagreed and responded to Howell's argument as follows:

> By its plain language, subsection (i) states that a person may not be sentenced under subsection (g) for offense*s* - plural - comprising a single episode of criminal conduct. Thus, subsection (i) prohibits a trial court from imposing a sentence enhancement on more than one conviction where a defendant is convicted of multiple offenses comprising a single episode of criminal conduct, even if more than one of the offenses would otherwise be eligible for a sentencing enhancement. To read subsection (i) as Howell suggests would lead to the absurd result that a person who was convicted of committing a single qualifying offense, say voluntary manslaughter, would be subject to a sentencing enhancement, but a person who committed voluntary manslaughter as part of an episode of criminal conduct could not be subject to a sentencing enhancement. Accordingly, we conclude that subsection (i) simply means that not more than one offense in a single episode of criminal conduct is subject to the sentencing enhancement. Thus, even if Howell's offenses can be said to comprise a single episode of criminal conduct, the Firearm Enhancement Statute permits a sentencing enhancement of one of his offenses (as long as that offense meets the definition provided in subsection (b), and as noted, there is no dispute that voluntary manslaughter qualifies).

*Id*. at 267-68.

[49] Here, although Jarrett admitted that he had used a firearm when he committed both murder and attempted robbery, subsection (i) of the Firearm Enhancement Statute prohibited the trial court from imposing an enhanced sentence on both of

those convictions. *See id*. at 267. However, subsection (i) permits a sentencing enhancement of one of Jarrett's convictions so long as that offense meets the definition provided in subsection (b). *See id*. at 268. Here, there is no dispute that Jarrett's attempted robbery conviction qualifies. Accordingly, the trial court did not err in enhancing Jarrett's attempted robbery conviction pursuant to the Firearm Enhancement Statute.

[50] Affirmed.

[51] Bradford, C.J., concurs.

[52] Weissmann, concur with separate opinion.

| Damonta Lamont Jarrett, | Court of Appeals Case No. 20A-CR-59 |
|---|---|
| *Appellant-Defendant,* | |
| v. | |
| State of Indiana, | |
| *Appellee-Plaintiff* | |

[53] Weissmann, Judge, concurring.

[54] I concur in the majority opinion. I write separately, however, to address a practical dilemma facing appellate courts, lawyers, and litigants in the wake of *Wadle*.

[55] In burying the *Richardson* test and birthing a substantially different double jeopardy analysis, our Supreme Court in *Wadle* necessarily changed the way in which defendants will challenge their convictions and sentences. *Wadle* makes clear that where, as here, convictions do not violate double jeopardy under the test it espouses, the defendant still has other means under the Indiana Constitution and Indiana Appellate Rule 7(B) to gain relief from multiple punishments. 151 N.E.3d

at 250. The latter allows an appellate court to revise a sentence, either upward or downward, where the court deems the sentence inappropriate in light of the nature of the offense and the character of the offender. *McCain v. State*, 148 N.E.3d 977, 985 (Ind. 2020).

[56] The *Wadle* ruling begs the question: how do we proceed in cases where the appellant's brief was filed before *Wadle* and, thus, the defendant did not have the benefit of *Wadle's* acknowledgement of possible alternative relief in the absence of double jeopardy violations? In such cases, the defendant may have refrained from raising an alternative sentencing claim due to confidence that his multiple convictions would be reversed based on *Richardson.* The *Wadle* test appears likely to produce fewer findings of double jeopardy violations than the *Richardson* test did, although only time will tell. If that prediction proves true, alternative sentencing claims will be even more important to a defendant under *Wadle* than under *Richardson*.

[57] When *Richardson* changed the landscape of double jeopardy claims more than two decades ago, the Indiana Supreme Court *sua sponte* raised double jeopardy claims under the new test in cases in which the appellant's brief was filed before that landmark decision. *See, e.g.*, *Logan v. State*, 729 N.E.2d 125, 136-37 (Ind. 2000); *Marcum v. State*, 725 N.E.2d 852, 864 (Ind. 2000); *Wise v. State*, 719 N.E.2d 1192, 1200-01 (Ind. 1999). However, this retroactive application appears limited to the *Richardson* analysis itself.

[58] The Indiana appellate courts, for instance, did not raise *sua sponte* Appellate Rule 7(B) claims for such defendants specifically in response to *Richardson*. That is not surprising, as *Richardson*, unlike *Wadle*, did not expressly suggest alternative forms of sentencing relief. Moreover, the Appellate Rule 7(B) standard at the time of *Richardson*—"manifestly unreasonable in light of the offense and the offender"— was so rigorous that it rarely produced sentencing relief. *Reed v. State*, 856 N.E.2d 1189, 1198 (Ind. 2006); *see* App. R. 7(B) (2002). The current version of Appellate Rule 7(B)—authorizing revision where the sentence is "inappropriate in light of the nature of the offense and the character of the offender"—offers a greater chance of relief than its predecessor. *See Serino v. State*, 798 N.E.2d 852, 856 (Ind. 2003); *see* App. R. 7(B) (effective Jan. 1, 2003). An Appellate Rule 7(B) claim thus is a much more viable alternative to a failed double jeopardy claim under *Wadle* than under *Richardson*.

[59] Jarrett did not raise an Appellate Rule 7(B) claim. Though the *Wadle* framework does not prohibit Jarrett's multiple punishments—consecutive sentences amounting to 65 years imprisonment—it does preserve Appellate Rule 7(B) as a potential alternative for defendants like him. 151 N.E.3d at 252. Alas, "[w]e do not generally review a sentence's appropriateness unless prompted by the defendant." *See Wilson v. State*, No. 19S-PC-548, slip op. at 20-29 (Ind. Nov. 17, 2020).

[60] Although Jarrett reasonably could not have anticipated *Wadle's* quantum leap in double jeopardy analysis, his case lacks the special circumstances which appear to be a prerequisite for rare *sua sponte* review under Appellate Rule 7(B). *See Wilson*,

slip op. at 20-19. Specifically, in *Wilson*, the defendant was 16 years old when he committed offenses for which he was sentenced to 183 years imprisonment— nearly three times longer than Jarrett's sentence. *Id.* at 24. Moreover, the defendant in *Wilson* was certain to gain relief due to specific, applicable precedent. *Id.* at 22-24, 27 (finding ineffective assistance of counsel where appellant's attorney "was ignorant of important recent precedents" with "largely analogous" facts). Whether Jarrett would succeed on an Appellate Rule 7(B) claim is far less clear. As *Wilson* appears to bar us from *sua sponte* review of Jarrett's sentence under Appellate Rule 7(B), I concur with the majority's opinion affirming the trial court's judgment.